IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Richard Whitescarver | : | |
| | : | Case No. C-1-03-911 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING PLAINTIFF'S |
| Sabin Robbins Paper Co., *et al.* | : | MOTION FOR JUDGMENT AND |
| | : | DENYING DEFENDANT'S MOTION |
| Defendants | : | FOR JUDGMENT |

This matter comes before the Court on Plaintiff's Motion for Judgment (doc. #13) and Defendant's Motion for Judgment (doc. #24). Plaintiff Richard Whitescarver brings this action seeking a declaration that he was terminated without cause for purposes of a retirement benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.. For the following reasons, the Court **GRANTS** Plaintiff's motion and **DENIES** Defendant's motion.

I.  **BACKGROUND**

Whitescarver is a former employee and the former president of Defendant Sabin Robbins Paper Company ("Sabin Robbins" or "the Company"), and during his employment he became a member of the Sabin Robbins Paper Co. Supplemental Executive Retirement Plan (the "Plan"). (Administrative Record ("AR") 15.)[1] The Plan provides retirement benefits to certain key employees of Sabin Robbins unless they "quit or are discharged with Cause" before their retirement date. (Id. p. 6, 8.) The Plan defines "Cause" as follows:

---

[1] The administrative record is attached as an exhibit to Doc. #13.

1

> For purposes of this Plan, "Cause" shall include only the disclosure of information (as specified in Section 2.03(a)), competition (as specified in Section 2.03(b)),[2] theft, fraud, dishonesty, embezzlement, disloyalty and intentional destruction of or wanton disregard for property, but only insofar as such actions relate to the Employer.

(Id. p. 8.)

On August 8, 2003, the Board of Directors of Sabin Robbins ("the Board") convened a special meeting and removed Whitescarver as the president of Sabin Robbins. (Id. p. 44-45.) Whitescarver remained an employee of Sabin Robbins, but he later resigned from the Board's Executive Committee and then from the Board. (Id. p. 46, 48.) Sabin Robbins contends that the Board gave Whitescarver a directive at the August 8th meeting not to have any unapproved contact with employees, associates, vendors, or customers of Sabin Robbins or its subsidiaries (the "no-contact directive"). (Id. p. 74, 85.) Whitescarver contends, on the other hand, that on August 8th he was told only to stay away from the Company's offices and that he was not given the no-contact directive until August 18, 2003. (Id. p. 63-65.)

On August 11, 2003, Whitescarver contacted the telephone company and had the bill for the cell phone he used changed from a Sabin Robbins account to a personal account. (Id. p. 66.) Subsequently, the Board gave Whitescarver certain limited responsibilities regarding a particular project, but the parties disagree whether Whitescarver fulfilled his responsibilities on the project. (Id. p. 50-59, 65, 74, 77.) In September 2003, Whitescarver submitted a reimbursement request to Sabin Robbins for his cell phone bill for the period beginning August 11, 2003. (Id. p. 66, 81.) Sabin Robbins later asked Whitescarver to provide an itemized phone bill to support the reimbursement request. (Id. p. 78.) Sabin Robbins also requested to see an unredacted version of

---

[2] Section 2.03 of the Plan is not relevant for purposes of these Motions for Judgment.

2

an American Express bill that Whitescarver had submitted. (Id.) In response, Whitescarver paid back the reimbursement for the phone bill saying the calls had been personal in nature and that he had submitted the reimbursement request by mistake. (Id. p. 66, 81.)

An additional dispute arose between the parties when Whitescarver took a vacation from October 21 through November 4, 2003 at the end of the Company's fiscal year. (Id. p. 83-84.)

While Whitescarver was on vacation, on October 23, 2003, Sabin Robbins terminated his employment using the express language that he was being terminated for cause and not eligible for benefits under the Plan. (Id. p. 85.) The termination letter stated that Whitescarver's cell phone records from August 8-10, 2003 had led the Company to conclude that Whitescarver engaged in multiple conversations that violated the no-contact directive. (Id.) Sabin Robbins had inferred that Whitescarver's communications "were not in furtherance of Sabin Robbins' business interests" because they were not authorized. (Id.) The Company had further inferred, from Whitescarver's "declination" to provide his cell phone records, that Whitescarver continued to violate the no-contact directive after August 10, 2003. (Id.) Finally, the letter stated that Sabin Robbins would reconsider its decision to terminate Whitescarver for cause if he furnished the details of his cell phone usage. (Id.)

In a November 10, 2003 letter, Thomas Roberts, the new president of Sabin Robbins, stated that because the Company still had not received details of Whitescarver's cell phone calls after August 10th, "for purposes of the [Plan], [his] termination from employment stands as a termination for 'Cause' as that term is defined in Section 4.01(c) of such Plan." (Id. p. 86.)

In a November 14, 2003 letter, Whitescarver requested to appeal the decision. (Id. p. 60.) He also provided a five-page sworn statement detailing the events leading up to and subsequent to

his termination. (Id. p. 62-66.)

In its written response dated November 26, 2003, Sabin Robbins explained its decision in more detail. (Id. p. 87-88.) It stated that the cell phone records the Company had from the period before August 11, 2003 demonstrated that Whitescarver had contacted three vendors and made multiple calls to employees in violation of the no-contact directive from August 8-10, 2003. (Id.) The Company also stated that "if this pattern of calls continued after August 10, 2003, Mr. Whitescarver was clearly acting in a manner that was disloyal to the Company." (Id.) The Company inferred that the calls did continue because Whitescarver refused to provide additional cell phone records. Finally, the Company again stated that it would reconsider its decision if Whitescarver produced the cell phone records. (Id.)

On December 22, 2003, Whitescarver provided a second sworn statement specifically addressing the nature of his communications with the Company's vendors during the August 8-10, 2003 period, but he did not provide the requested cell phone records from August 11, 2003 and thereafter. (Id. p. 89-91.)

Instead, on December 24, 2003, Whitescarver initiated the instant action against Sabin Robbins, in its corporate capacity and as the administrator of the Plan, seeking a judicial declaration that he was terminated without cause under the Plan. (Doc. #1.) Both parties have now filed Motions for Judgment on the pleadings consistent with the Sixth Circuit's dictate for the resolution of ERISA actions for benefits. See Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J. concurring and joined by Ryan, J.).

## II. STANDARD OF REVIEW

Whitescarver brings this action pursuant to ERISA § 502(a)(1)(B) as a participant seeking

4

"to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In reviewing actions brought under § 502(a)(1)(B), courts generally are guided by principles of trust law. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-11 (1989). Under trust principles, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." See id. at 115. The deferential arbitrary and capricious standard applies if the plan or policy grants the administrator the power to determine eligibility for benefits, or to construe the terms of the plan. See id.; Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991).

Arbitrary and capricious review is the least demanding form of review of an administrative action. See Davis v. Kentucky Fin. Cos. Retirement Plans, 887 F.2d 689, 693 (6th Cir. 1989). "[A]n ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are 'rational in light of the plan's provisions.'" Miller, 925 F.2d at 984 (citing Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988)). Stated differently, the plan administrator's decision must be upheld "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome" or when it is "the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." Killian v. Healthsource Prov. Admins., Inc., 152 F.3d 514, 520 (6th Cir. 1998) (internal quotations and citations omitted). A conflict of interest should be taken into account as a factor in the examination of whether a decision was arbitrary and capricious. See Davis, 887 F.2d at 694.

Courts use federal common law rules of contract interpretation to determine if a benefits

plan grants discretionary authority.  See Perez v. Aetna Life Ins. Co., 150 F.3d 550, 556 (6th Cir. 1998) (en banc).  Sabin Robbins contends that the following language from the Plan is sufficient to confer discretion upon it:

> Interpretation.  The Employer shall have the authority to administer this Plan.  The administration of the Plan by the Employer, and any action taken hereunder shall be binding and conclusive upon all parties having an interest under this Plan.

(AR 12.)  The Sixth Circuit has held that similar "binding and conclusive" language in other ERISA plans was sufficient to confer discretion and warranted arbitrary and capricious review.  See e.g. Colaluca v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., No. 95-3326, 1997 WL 49026, at *3 (6th Cir. Feb. 4, 1997); Bartling v. Fruehauf Corp., 29 F.3d 1062, 1071 n.11 (6th Cir. 1995); Davis, 887 F.2d at 694.  Thus, this Court should review the decision to characterize Whitescarver's termination as for cause under the arbitrary and capricious standard.

Despite this Plan language granting discretion to Sabin Robbins, Whitescarver makes two arguments that the Court nonetheless should apply a *de novo* review.  The Court finds for the following reasons that neither argument has merit.  First, Whitescarver contends that the Court should apply a *de novo* review because the Plan is a top-hat plan[3].  Top-hat plans are exempt from ERISA's fiduciary duty provisions.  See  29 U.S.C. § 1101(a)(1).  The Third Circuit held, for this reason, that a top-hat plan cannot be analogized to a trust and that an administrator's decisions are therefore not entitled to an arbitrary and capricious review.  See Goldstein v. Johnson & Johnson, 251 F.3d 433, 436 (3rd Cir. 2001).  Instead, the Third Circuit stated that where a plan grants the administrator discretion, the administrator's decision is to be reviewed *de novo* to determine if the

---

[3] A top-hat plan is a common name for "a plan which is unfunded and is maintained by an employer primarily for the purposes of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2)

6

administrator exercised that discretion consistent with the implied duty of good faith and fair dealing. See id. at 436, 443.

The Sixth Circuit has not addressed the Goldstein decision. This Court finds the Goldstein position to be faulty because it cannot be reconciled with two key provisions in the Supreme Court's Bruch decision. The Supreme Court held in Bruch that the default *de novo* standard applied unless the plan gave discretion to either "the administrator *or* fiduciary," implying that not all administrators are fiduciaries. 489 U.S. at 115 (emphasis added). The Supreme Court also stated that "we need not distinguish between types of plans" and "the *de novo* standard of review applies [as the default standard of review] regardless of whether the plan at issue is funded or unfunded." Id. Therefore, this Court holds that under Bruch an arbitrary and capricious standard of review must be applied where a plan gives discretion to an administrator, even if the plan is a top-hat plan and even if the administrator is not a fiduciary. See Adams v. Louisiana-Pacific Corp., 284 F. Supp. 2d 331, 336 (W.D.N.C. 2003) (rejecting Goldstein on the basis of the same analysis); Scipio v. United Nat. Bankshares, Inc., 284 F. Supp. 2d 411, 417, n.10 (N.D. W.Va. 2003) aff'd No. 03-2282, 2004 WL 2980756 (4th Cir. Dec. 22, 2004) (same). Because this Plan does give discretion, the arbitrary and capricious standard of review should apply.

In his second argument, Whitescarver contends a *de novo* review should be applied, even though the Plan vested Sabin Robbins with discretion, because Sabin Robbins did not exercise discretion when it refused to consider his appeal without the additional cell phone records. (AR 87-88.) His argument fails in light of Sixth Circuit precedent. By federal regulation, ERISA appeals are deemed denied after sixty days if an administrator does not issue a decision. See

Daniel, 839 F.2d at 267 (citing 29 C.F.R. § 2560.503-1(h)(4)). The Sixth Circuit has held that the standard of review to be applied to the administrator's denial of benefits is "no different whether the appeal is actually denied or is deemed denied." Id.; see also Heffernan v. UNUM Life Ins. Co. of America, No. C-1-97-545, 2001 WL 1842465, at *2 n.1 (S.D.Ohio Mar. 21, 2001). Thus, the Company's refusal to issue a new decision on appeal does not affect the standard of review.[4]

### III.  ANALYSIS

There are several issues in dispute here, both factual and legal. The questions to be resolved include: (1) Was the no-contact directive issued on August 8, 2003 or on August 18, 2003? (2) If the no-contact directive was issued on August 8th, did Whitescarver violate the directive between August 8-10, 2003 or after August 10, 2003? (3) Does a violation of the no-contact directive establish disloyalty under the terms of the Plan so as to support Sabin Robbins termination with cause decision? (4) Is there any other evidence of disloyalty in the record?

First, there is no definitive evidence in the record concerning when the no-contact

---

[4] In applying an arbitrary and capricious standard of review, the Court is not influenced by the "business judgment rule." Sabin Robbins argues that its decisions to remove Whitescarver as president of the Company and subsequently to terminate him for cause must be presumed to have been reasonable under the business judgment rule. The sole case cited by Sabin Robbins to support its argument, Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co., 26 Ohio St. 3d 15, 496 N.E.2d 959 (1986), is not an ERISA case. The Ohio Supreme Court in Gries Sports explained that the business judgment rule applies in situations where a corporation and its minority shareholders challenge decisions made by the board of directors that the shareholders claim are adverse to the interests of the company. See 26 Ohio St. 3d at 20. The business judgment rule has "traditionally operated as a shield to protect directors from liability for their decisions." Id. Whitescarver does not seek to impose liability on the Sabin Robbins Board of Directors in this ERISA action, nor does he seek to protect the interests of the Company; instead, he seeks to recover benefits to which he is allegedly entitled under the Plan. This Court holds that the business judgment rule is inapplicable to an administrator's decision to deny benefits to a participant in a top-hat plan. See Hilton Hotels Corp. v. Dunnet, 275 F. Supp. 2d 954, 966 & n.1 (W.D. Tenn. Dec. 28, 2002) (holding that business judgment rule did not apply to decision made regarding optionee's rights under stock option plan).

directive was issued. Sabin Robbins contends that the Board gave Whitescarver the directive at the August 8, 2003 Board meeting after he had been formally removed as president. (AR 74, 87.) The record does not contain minutes from the August 8th meeting to support or refute the Company's contention. Whitescarver asserts that Sabin Robbins did not give him the no-contact directive until August 18, 2003 during a telephone conference. (Id. p. 64-65.) Though Whitescarver offers the sworn statement of former Board member Dick Bere that the no-contact directive was not given at the August 8, 2003 Board meeting, Bere's statement is of limited value because Bere left the Board meeting in protest before the meeting ended. (Id. p. 63-64, 93.) The strongest indication that the directive was issued on August 8, 2003 are statements to that effect in e-mails from Tom Roberts of Sabin Robbins to Whitescarver dated September 18, 2003 and October 2, 2003. (Id. p. 74, 77.) Whitescarver did not contemporaneously object to these statements. In the absence of conclusive proof, and because the finding does not affect the outcome of this case, the Court assumes that Sabin Robbins issued the no-contact directive on August 8, 2003.

Sabin Robbins states that the Company cell phone bill from the period of August 8-10, 2003 establishes that Whitescarver made calls to one vendor seven times, a second vendor four times, a third vendor one time, and unnamed employees multiple times. (Id. p. 87-88.) Whitescarver admits that he contacted Don Marikovics, a vendor, and "spoke about the Executive Committee's actions," but he states that Marikovics already knew about his dispute with the Executive Committee because he had been with Marikovics in New York City during the events leading up to his removal as president. (Id. p. 91.) Whitescarver also admits to calling the two other vendors, whom he describes as "close friends" who knew something had

9

happened between Whitescarver and the Executive Committee, and "were interested to find out what had taken place." (Id.) No evidence in the record refutes Whitescarver's explanation for these vendor communications. As to his calls to the unnamed employees, there is no evidence in the record about who the employees were or why Whitescarver called them.

Regarding Whitescarver's actions after August 10, 2003, Sabin Robbins concedes that it has no evidence Whitescarver talked to vendors, suppliers or employees without the Board's consent. Rather, Sabin Robbins states that Whitescarver's refusal to provide the cell phone records for the period after August 10th led it to "infer" that he violated the no-contact directive and acted disloyally in doing so. (Id. p. 85, 87-88.) Finally, it is undisputed that Whitescarver took a vacation from October 21 through November 4, 2003 at the end of the Company's fiscal year. (Id. p. 83-84.) Tom Roberts of Sabin Robbins stated that he was "hard pressed to approve" the vacation, but he did expressly prohibit the vacation. (Id. p. 83.) Instead, Roberts requested a schedule of Whitescarver's "availability for phone, e-mail, or personal meeting contact" through October 31, 2003. (Id.) Whitescarver responded that he could be reached by e-mail every evening during his vacation. (Id. p. 84.)

Upon review of this record, the Court finds that there is substantial evidence that Whitescarver disobeyed the letter of the no-contact directive by contacting three vendors and unnamed employees from August 8th-10th, but there is not substantial evidence that Whitescarver acted disloyally. Sabin Robbins cites to Webster's Third New International Dictionary (unabridged 1981) and Black's Law Dictionary (5th Edition), for the proposition that disloyalty can be defined, to paraphrase, as a lack of allegiance, a lack of adherence to obligations or promises, or unfaithfulness. It does not cite to any caselaw applying these

10

definitions of disloyalty, or any other definition of disloyalty, to an employment situation. Whitescarver, on the other hand, cites to section 387 of the Restatement (Second) of Agency for the more narrow principle that an "employee has a duty to act solely for the benefit of the principal in all matters connected with his agency." To the extent that the Plan is susceptible to more than one interpretation, the ambiguities must be construed against Sabin Robbins, the drafting party. See University Hosps. of Cleveland v. Emerson Elect. Co., 202 F.3d 839, 847 (6th Cir. 2000) (tempering the arbitrary and capricious standard).[5]

Sabin Robbins told Whitescarver that the no-contact directive was necessary because the Company "faced a number of significant business challenges" and needed to know that only members of the Executive Committee "were speaking on behalf of the Company . . . and . . . had direct access to all relevant information from the vendors, customers and employees." (AR 87.) The record is devoid of evidence that Whitescarver at any time misrepresented his authority to speak on behalf of Sabin Robbins or interfered with the communication of relevant information between the vendors, or the employees, and Sabin Robbins. Sabin Robbins admits that it "infer[red] the contacts were not in furtherance of Sabin Robbins' business interests" because the contacts were not authorized. (Id. p. 85.) There is no suggestion in the record that Sabin Robbins spoke with its employees or with the vendors whom Whitescarver might have contacted to determine the context or substance of those communications. Thus, Sabin Robbins relied on speculation, not facts in the record, when it concluded that Whitescarver acted unfaithfully or

---

[5] This holding was criticized in dicta by a different Sixth Circuit panel in the unpublished decision, Mitchell v. Dialysis Clinic, Inc., No. 00-5467, 2001 WL 1006291, *3 (6th Cir. Aug. 24, 2001). However, the holding was not overturned and it remains good law. See Sherry v. Hartford Life & Acc. Ins. Co., 314 F.Supp.2d 714, 722 n. 11 (N.D. Ohio 2004).

against the Company's interests.

Finally, regarding Whitescarver's unauthorized vacation, Sabin Robbins did not give this as a reason for the termination with cause decision until this litigation began. The record is not clear that Whitescarver required prior authorization to take a vacation. (Id. p. 83-84.) Also, Whitescarver agreed to the Company's request to be available by e-mail during his vacation. (Id. p. 84.) Sabin Robbins points to no evidence in the record that Whitescarver failed to fulfill obligations he had made to the Company by taking the vacation. Accordingly, the decision to terminate Whitescarver for cause on the grounds of alleged disloyalty was not the result of a principled reasoning process nor is it supported by substantial evidence in the record, and the Court cannot uphold it under even under an arbitrary and capricious review. See Killian, 152 F.3d at 520.

## IV. CONCLUSION

For the foregoing reasons, the Court holds that Plaintiff Richard Whitescarver's termination was without cause as that term is defined and applied in the Plan. Plaintiff's Motion for Judgment (doc. #13) is **GRANTED** and Defendant's Motion for Judgment (doc. #24) is **DENIED**. However, the Court reserves judgment on the issue of whether Plaintiff is entitled to attorney's fees and costs as neither party has briefed the issue.

IT IS SO ORDERED.

                                                                                              ___s/Susan J. Dlott_____
                                                                                              Susan J. Dlott
                                                                                              United States District Judge